An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-103

Filed 4 March 2026

Mecklenburg County, No. 21JA000537-590

IN THE MATTER OF: B.E.

Appeal by Respondent-Mother from order entered 16 October 2024 by Judge Elizabeth T. Trosch in Mecklenburg County District Court. Heard in the Court of Appeals 20 February 2026.

*Parent Defender Annick Lenoir-Peek for Respondent-Appellant Mother.*

*Mecklenburg County Attorney's Office, by Senior Associate Attorney Kristina A. Graham, for Petitioner-Appellee Mecklenburg County Youth and Family Services.*

*Winston & Strawn LLP, by Stacie C. Knight, for Appellee Guardian ad Litem.*

PER CURIAM.

Mother appeals from the trial court's order terminating her parental rights to her minor child, Bryson.[1] She argues that the court erred by finding grounds existed to terminate her parental rights and abused its discretion by determining it was in

---

[1] A pseudonym is used to protect the identity of the minor child.

Bryson's best interest to do so. We affirm the court's order.

## I.  Background

Mecklenburg County Youth and Family Services ("YFS") became involved with Mother and Bryson in February 2021, following a report that Bryson was present when Mother threatened others with a knife and bit the responding EMT, which led to her arrest for felony assault of emergency personnel. YFS received a similar report in July 2021, alleging Mother had had an altercation with her roommate, which also involved a knife. Mother was arrested on 9 October 2021 for assault after biting her boyfriend during an altercation.

On 27 October 2021, police responded to a report alleging Mother was intoxicated and throwing items off her apartment balcony. Officers transported her to Atrium Behavioral Health for an evaluation, which she did not complete. When YFS visited her home later that day, Bryson was present and Mother was intoxicated. Mother agreed to place Bryson with her sister as a temporary safety provider. Mother also entered into a safety plan, wherein she agreed to substance abuse treatment and random drug screens. She attended three treatment sessions, but she missed her 6 December 2021 session.

Mother was arrested on 5 December 2021 after she assaulted her sister, attempted to remove Bryson from her sister's home, and assaulted the responding officers. In a subsequent interview, Mother denied being intoxicated at the time of the assault, though she did admit to biting her sister and responding officers.

Mother's aunt reported that Mother had a history of alcohol abuse and assaultive behavior. Bryson discussed "the various assaults as if that [was] normal behavior" and did "not appear bothered by it."

On 17 December 2021, YFS filed a juvenile petition alleging Bryson was a neglected and dependent juvenile and obtained nonsecure custody. In addition to the above reports, the petition alleged Mother had criminal charges related to assaultive behavior, and a prior child welfare case related to substance abuse, in Pennsylvania, where she and Bryson had previously lived.

The juvenile petition came on for hearing on 11 February 2022. By order entered 16 March 2022, the court adjudicated Bryson neglected and dependent, based on Mother's stipulations to the allegations in the petition. The court continued legal custody of Bryson with YFS; allowed Mother two-hour supervised visits twice weekly in addition to three days of telephone contact; and ordered Mother to obtain substance abuse and mental health screenings, comply with all recommendations, and participate in random drug and alcohol screenings. The court set the primary plan as reunification and the secondary plan as legal guardianship or adoption.

The first permanency planning hearing was held on 4 May 2022. In the resulting order, the court found Mother was actively participating in her case plan. The court found Mother was "making great progress and she should be proud of herself[,]" as she had started therapy, attended weekly parenting classes, completed substance abuse treatment, and received a pay raise at her job. However, the court

found Mother was acting in a manner inconsistent with Bryson's health and safety by arriving late to, and physically disciplining Bryson during, visits. Nonetheless, the court "recognize[d]" Mother was "working on this." The court maintained reunification as the primary plan and set adoption as the sole secondary plan. The court allowed Mother additional, unsupervised visitation and gave YFS discretion to begin overnight visits.

Mother's behavior deteriorated prior to a second permanency planning hearing on 19 July 2022. In the resulting order, the trial court found Mother "allegedly assaulted her neighbor and police were called" two days before the hearing, and "[w]ithin the past month" Mother "let herself into the maternal aunt's house and assaulted the aunt when asked to leave." The court nevertheless determined Mother was still making adequate progress and actively participating in and cooperating with her plan. The court reinstated supervised visitation but allowed for unsupervised visitation to resume following continued improvement.

Mother was arrested twice more before a third permanency planning hearing on 13 September 2022. Based on her "aggressive behaviors and inconsistent visitation[,]" the court found Mother was no longer making adequate progress. The court ordered Mother submit to a psychological evaluation and comply with any recommendations. The court also ordered YFS to initiate a termination of parental rights action if Mother failed to make progress by the next hearing.

A fourth permanency planning hearing was held on 6 December 2022. In the

resulting order, the trial court found that Mother was not making adequate progress due to her inconsistent participation in services and her continued minimizing of "her threatening behaviors, which resulted in pending criminal charges[.]" The court also found Mother was not complying with the recommended mental health services. The court concluded that termination of Mother's parental rights would be in Bryson's best interest and changed the primary permanent plan to adoption or guardianship, with a secondary plan of reunification.

The court made similar findings and conclusions after a fifth permanency planning hearing, held on 14 March 2023. Mother had testified that she was willing to follow the recommended mental health plan "only to an extent[,]" and the court ordered her to comply with all recommendations to prevent the cessation of reunification efforts.

On 5 June 2023, eighteen months after Bryson's removal from Mother's care, YFS filed a petition to terminate her parental rights, alleging grounds of neglect, failure to make reasonable progress in correcting the conditions that led to Bryson's removal, failure to contribute to the cost of care, and dependency.

Pending termination proceedings, permanency planning hearings continued. In the order resulting from a hearing held on 29 August 2023, the court commended Mother for her progress, finding she had "made a total turnaround during this review period" and "largely completed her treatment plan with the exception of housing." In its summary submitted to the court, YFS detailed Mother's significant progress,

including attending Alcoholics Anonymous meetings, consistently testing negative on drug screens and attending visitation, attending therapy, taking her medication, and expressing remorse and taking accountability for her past actions. The court found that Mother needed to demonstrate sustained progress for at least six months before reunification could be considered, though it remained as the secondary permanent plan. The court adopted the YFS and GAL recommendations for unsupervised visitation and ordered YFS to assist Mother with her housing search.

Thereafter, Mother's progress stalled. In the order resulting from a 31 January 2024 permanency planning hearing, the court found Mother was making minimal progress. She was homeless, was reportedly acting "drunk and belligerent" at the shelter where she stayed, and she had missed a scheduled visitation. However, she was employed and remained enrolled in therapy. YFS attributed Mother's "downward spiral" to her eviction that led to homelessness. The court found reunification was still possible if Mother "adequately addresse[d] mental health, housing, and substance abuse[,]" and reunification remained the secondary permanent plan.

In the order resulting from a 5 June 2024 permanency planning hearing, the court noted Mother's "intermittent progress on her case plan during the course of this review period." The court found that since the last hearing, there were at least three reports of Mother being "under the influence of some impairing substance affecting her mood and behavior." Moreover, she exhibited "concerning behavior" at the

hearing that resulted in an immediate drug screen, which came back positive for alcohol.

Mother was required to submit to regular drug screens leading up to a 24 July 2024 permanency planning hearing. She did not appear for her first scheduled screen; was reportedly "argumentative and belligerent" prior to the start of the next scheduled screen, though she tested negative for any substances; and tested negative at the last screen before the hearing. She appeared virtually for the hearing, so testing was not possible, but the court found that Mother's erratic and emotional behavior, heavy and glassy eyes, and repeated disruptions "clearly" indicated she was again under the influence of alcohol despite her denial.

The court also found Mother displayed unregulated behavior during a visit with Bryson the month prior, and her history of explosive behavior created a "chaotic, unstable, [and] combative home environment." Her "unrestrained combativeness and dysregulation" had impacted Bryson's "emotional and physical health[,]" causing him to experience "extreme anxiety" that he had spent years addressing in "trauma specific therapy[.]" The court found it was in Bryson's best interest to cease reunification efforts. The primary plan was changed to adoption, and the secondary plan was changed to guardianship or custody.

The matter came on for a termination hearing on 21 August 2024. By order entered 16 October 2024, the court concluded that grounds existed to terminate Mother's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), (2), and (6).

The court further concluded that termination of Mother's parental rights was in Bryson's best interest and terminated her parental rights.[2] Mother timely appeals.

## II. Discussion

Mother argues the trial court erred in concluding that grounds exist to terminate her parental rights and that it was in Bryson's best interest to terminate her parental rights.

"Termination of parental rights involves a two-stage process." *In re A.W.*, 288 N.C. App. 123, 125 (2023) (quotation marks and citation omitted). "At the adjudication stage, the petitioner has the burden of proving by clear, cogent[,] and convincing evidence that at least one statutory ground for termination exists." *In re T.C.B.*, 166 N.C. App. 482, 484-85 (2004) (citations omitted). If one or more grounds exist, the trial court then proceeds to the disposition stage where it determines whether termination of parental rights is in the best interest of the child. N.C. Gen. Stat. § 7B-1110(a) (2025).

### A. Grounds for Termination

We review an adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent[,] and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (citations omitted). Findings of fact supported by clear, cogent, and

---

[2] Bryson's father relinquished his parental rights prior to the start of the hearing, on or around 19 August 2024.

convincing evidence are "deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citation omitted). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re M.T.*, 285 N.C. App. 305, 336 (2022) (quotation marks and citations omitted). We review the trial court's conclusions of law de novo. *Id.*

### 1. Challenged Findings of Fact

Mother challenges eight of the trial court's thirty-seven findings of fact, arguing they were unsupported by the evidence presented at the termination hearing:

> 30. There have been no recommendations for medication management or a specific modality of treatment for [Mother] presented during these proceedings. She reports that she is engaged in therapy but has not provided proof to the department since January 2024.
>
> 31. [Mother's] testimony today reflected that she is engaged with a therapist and has been since March 2024, but she has not signed releases or provided this information to the department. The [c]ourt further finds that [her] testimony demonstrated a total lack of insight into the reasons for her son being placed into the custody of the department. [Mother] could not articulate how her therapy is tailored to address the issues raised by the [c]ourt, or how that therapy is addressing her repeated assaultive conduct and developing coping skills or self-regulation.
>
> 32. [Mother] reports being titrated off medication. There is no evidence that she would benefit from medication to address the behaviors that the [c]ourt has repeatedly identified throughout the life of this case.

. . . .

34. While [Mother] has intermittently engaged in services, the services have not ameliorated the issues that brought the juvenile into custody as evidenced by her recent conduct of escalating encounters with strangers and her conduct during the last two hearings in this court.

35. [Mother] did complete parenting classes early in this process. However, when asked during these proceedings what she learned in the parenting classes that she completed in 2022, [she] did not articulate any specific skill, insight, or practice that she learned to enhance her parenting. She simply said, "I'm an awesome parent, and my son is very bright."

36. Despite availing herself to behavioral health, mental health, and substance abuse services, [Mother] has ultimately demonstrated she is not capable of the self-regulation required to maintain a violence-free, substance-free lifestyle. The [c]ourt finds that, while [Mother] was not found to be in need of substance abuse treatment in July 2024, the fact that she appeared clearly under the influence of a substance, specifically alcohol, during the June 2024 hearing and displayed conduct evidencing such, demonstrates that her use of substances is maladaptive and contributed to the issues that brought [Bryson] into custody. [Mother's] unwillingness to acknowledge that her consumption of alcohol has affected her behavior and her ability to create a safe stable home for her son demonstrates that there is a high probability of repetition of neglect if [Bryson] was returned to [her] custody.

37. The Court finds that, despite checking some boxes on the case plan, [Mother] has not made adequate progress in addressing the clear issues that brought [Bryson] into the custody of YFS.

As to Findings of Fact 30 through 32, Mother argues YFS failed to provide any evidence from her "prior or current mental health providers[,]" which she contends

was its burden to present. This argument has no merit. On review, we do not look to see who presented the evidence, only that there is evidence to support the findings. *In re E.H.P.*, 372 N.C. at 392. And there is ample evidence to support these challenged findings, with much of it coming from Mother's own testimony on direct examination by YFS counsel. Additionally, there was supporting evidence from the assigned social worker's testimony, the court's prior orders, and the reports prepared for those related hearings.

Mother also argues she "specifically testified" as to the issues being addressed in therapy, which appears to challenge the portion of Finding of Fact 31 stating she "could not articulate how her therapy is tailored to address the issues raised by the [c]ourt, or how that therapy is addressing her repeated assaultive conduct and developing coping skills or self-regulation." However, her testimony does not contradict the court's findings. When asked what she was discussing with her current therapist, Mother said, "Well, right now we're discussing -- we discussing problems or financial stability, and she's really good with giving me resources. I talk to her about my situation going on right now. We talk about a lot of different things. Relationships with people, you know." When asked to clarify what they discussed about relationships, Mother stated, "Just -- just being around positive. She support me about being around positive people." This testimony does not show how therapy addresses her history of assaultive behavior or helps her sufficiently develop coping skills and self-regulation. Moreover, even if her testimony could support a contrary

finding, Findings of Fact 30 through 32 are supported by clear, cogent, and convincing evidence and therefore conclusive on appeal. *In re B.O.A.*, 372 N.C. at 379.

As to Finding of Fact 34, Mother contends that she has improved over the course of the case, as she started with "repeated criminal charges for her violent and disruptive behavior," and just before the termination hearing had "some type of verbal dispute with strangers," but no physical altercation. She also acknowledges that her behavior at the two prior permanency planning hearings was "inappropriate[,]" but argues that there was no finding she was impaired, under the influence, or disruptive at the termination hearing. Rather than refuting Finding of Fact 34, Mother's arguments further support the trial court finding she had "intermittently engaged" with services and failed to ameliorate the issues that resulted in Bryson's removal. As detailed above, Mother did, for a time, cease her aggressive behaviors and made significant progress towards reunification. However, of great concern was Mother's history of engaging in violent behaviors in front of Bryson and creating a "chaotic, unstable, [and] combative home environment[,]" which resulted in Bryson's "extreme anxiety." While she frames her recent confrontation as progress because she only engaged in a verbal dispute and not a physical one, it occurred in front of Bryson. This altercation exhibits a step backwards from the progress she had previously made.

Similarly, while it appears she was not disruptive during the termination hearing, Mother's improvement at one hearing following inappropriate behavior at

the two prior is another example of the progress and regression that has existed over the life of the case. Thus, while Mother exhibited improvement overall between the initial disposition hearing and the termination hearing, the evidence supports a finding that the issues that led to Bryson's removal had not been ameliorated.

Mother contends Finding of Fact 35 fails to consider how she demonstrated the skills she learned in her parenting classes during visits with Bryson over the summer of 2023. However, the finding addresses her inability to "articulate any specific skill, insight, or practice that she learned" when questioned at the termination hearing, which is supported by her testimony. When specifically asked what she learned in her parenting classes, Mother stated: "Well, I believe that I'm an awesome parent. I know there's room for growth, but they taught a lot of ways to discipline a child. My child isn't -- I wouldn't say he's an angel, but he don't need discipline. He's very bright." When asked how her parenting had changed over the life of the case, Mother stated: "Me and my son's relationship has grown a lot. He's getting older, and he's getting wiser. I'm getting aware of things and that's about it." Thus, Finding of Fact 35 is supported by her testimony.

Moreover, Mother does not challenge Findings of Fact 15 and 16, which detail how, in May 2022, she slapped Bryson during one visit and "inappropriately discipline[d]" him during another. She also does not challenge Finding of Fact 26, which details her engaging "in combative actions with a stranger in [Bryson's] presence" during a visitation in June 2024. As with her general behaviors, the

evidence establishes a similar fluctuating pattern of improvement in her parenting abilities.

Finally, Mother's objections to Findings of Fact 36 and 37 are that these findings are in fact conclusions of law. We agree that these findings contain conclusions of law, and we will review those conclusions below. However, Finding of Fact 36 does include ultimate findings, which exhibit findings made by the natural reasoning of the court. *In re G.C.*, 384 N.C. 62, 65 n.3 (2023). "A trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the trial court's ultimate finding of fact." *Id.* at 65 (quotation marks and citation omitted). All of Mother's evidentiary arguments are without merit, and the Findings of Fact support the trial court's ultimate finding that Mother "ultimately demonstrated she [was] not capable of the self-regulation required to maintain a violence-free, substance-free lifestyle." Thus, we must determine whether the court's findings support its adjudication of grounds for termination.

### 2. *Neglect*

Mother contends the trial court erred by concluding grounds existed to terminate her parental rights for neglect pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) because the evidence does not support a finding that there was a likelihood of future neglect.

A court may terminate parental rights upon a finding that the parent has neglected the juvenile. N.C. Gen. Stat. § 7B-1111(a)(1) (2025). A neglected juvenile

is one "whose parent, guardian, custodian, or caretaker" "[d]oes not provide proper care, supervision, or discipline[,]" or who "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." *Id.* § 7B-101(15)(a), (e) (2025). "Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent." *In re M.T.*, 285 N.C. App. 305, 337 (2022) (quotation marks and citation omitted). To determine whether such future neglect is likely, the trial court "must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re R.L.D.*, 375 N.C. 838, 841 (2020) (quotation marks and citations omitted).

The court's findings of fact reflect careful consideration of Mother's progression and regression between Bryson's removal in December 2021 and the termination hearing in August 2024. As the court found, Mother has, at times, engaged in her case plan. However, her repeated inability to address her violent behavior and alcohol abuse–even appearing before the court under the influence at a permanency planning hearing two months prior to termination–support the court's conclusion that the neglect of Bryson is likely to continue in the future.

The court found Mother had a "well-documented history" of "engaging in combative and assaultive conduct[,]" which caused Bryson "anxiety" and resulted in housing instability. While she was making some progress on her case plan between

May and July 2022, the court found she slapped Bryson during one visit; inappropriately disciplined him during another visit; and assaulted her sister, with whom Bryson was living, in the sister's home. Mother was arrested for assault between July and September 2022; she continued to minimize her aggressive behaviors and refused to consistently engage in services, including mental health services, until the summer of 2023. The court found Mother had exhibited significant improvement by August 2023, which allowed her to begin unsupervised visitation. The court found this progress was short-lived, and Mother was reportedly intoxicated multiple times leading up to the January 2024 permanency planning hearing. Her behavior at the subsequent permanency planning hearing resulted in a drug screen, which came back positive for alcohol, and she exhibited similar behavior while virtually attending the July 2024 hearing. It was during this time of increased substance use that she "engaged in combative actions with a stranger" during visitation with Bryson. These findings resulted in the court ultimately finding that "[d]espite availing herself to behavioral health, mental health, and substance abuse services," Mother has "demonstrated she is not capable of the self-regulation required to maintain a violence-free, substance-free lifestyle."

Given these unchallenged and adequately supported challenged findings, the trial court did not err in concluding that grounds exist to terminate Mother's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1). As only one ground is necessary to support termination of parental rights, we need not address Mother's additional

arguments on appeal pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) or (6). *In re A.R.A.*, 373 N.C. 190, 194 (2019).

## B.    Best Interest

Mother also argues that the court "committed reversible error by finding it was in Bryson's best interest" to terminate her parental rights.

"The trial court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion." *In re Z.L.W.*, 372 N.C. 432, 435 (2019) (citations omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (quotation marks and citation omitted).

"After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2025). This determination is based on:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

*Id.*

"[W]hen it is clear from the termination order that the trial court considered the relevant dispositional criteria, made proper findings, and made a reasoned determination that termination of parental rights was in the juvenile's best interest . . . an appellate court should not second-guess the trial court's best interests determination." *In re R.G.L.*, 379 N.C. 452, 469-70 (2021). "[T]he trial court, which is involved in the case from the beginning and hears the evidence, is in the best position to assess and weigh the evidence, find the facts, and reach conclusions based thereon." *In re Z.A.M.*, 374 N.C. 88, 100 (2020).

Here, in considering the dispositional factors pursuant to N.C. Gen. Stat. § 7B-1110(a), the trial court found, in pertinent part, that:

> 3. The permanent plan for the juvenile is adoption. [Mother] maintaining her parental rights is a barrier to adoption.
>
> 4. [Bryson] is eight years old and has been outside of [Mother]'s care for 980 days, which equates to thirty percent of his life.
>
> 5. While in the care and custody of [Mother], [Bryson] experienced significant instability and chaos which has had an impact on his mental health. He has suffered significant anxiety, and the stress of the experiences he had to endure during the other 70% of his life is impacting him today.
>
> . . . .

7. [Bryson] has been placed with a foster parent . . . and has benefitted from stability, structure, a routine, and the ability to be consistent with medication and therapy.

8. This [c]ourt having found grounds for termination of parental rights, including grounds relating to [Mother]'s unaddressed emotional volatility, demonstrates that retaining parental rights would subject [Bryson] to continued instability, volatility, and unpredictability and that would be contrary to his best interest.

9. [Bryson] is young and bright, the likelihood of adoption is high, and termination of [Mother]'s parental rights will assist in providing permanence.  Two people have come forward as potential adoptive parents.  Both the foster parent and a maternal aunt in Delaware are working with the department to be permanent placements.

10. In consideration of the bond between [Bryson] and [Mother], the [c]ourt finds that [Bryson] loves [Mother], and [Mother] loves [Bryson].  They have a strong sense of connection, affection, and loyalty for each other. However, the [c]ourt cannot say that this is a healthy bond because [Bryson] has suffered a great deal of anxiety stemming from [Mother]'s actions and lack of follow through.  The [c]ourt cannot determine whether time between [Mother] and [Bryson] would be stressful or stress free.  Although they do have a reciprocal bond, it does not necessarily mean that they have a healthy bond.  The [c]ourt finds that the bond between mother and child is weakened by stress and the insecurity of not knowing what will happen and whether [Mother] will follow through.

11. The [c]ourt finds that it appears that the primary proposed adoptive parent is the maternal aunt . . . in Delaware.  [The proposed adoptive parent's] family has a strong dynamic.  [Bryson] has a familial connection and a strong bond with [the proposed adoptive parent] that would facilitate his continued belonging to that family.

 . . . .

13. The [c]ourt finds it to be true that terminating [Mother]'s parental rights deprives her of any parenting time and deprives the [c]ourt of creating such right. It is also true that there is a significant risk that terminating [Mother]'s rights would result in the termination of a relationship and adverse emotional effects on [Bryson]. However, the [c]ourt has to consider the pain and loss of that relationship against the continued chaos, volatility and instability of having the parental relationship. So, putting those two things against one another, the harm of taking [Bryson] away from [Mother] is outweighed by the harm that leaving him in foster care indefinitely would cause.

14. The [c]ourt finds that [Mother] acted contrary to her constitutional rights as a parent.

15. It is in the best interest of the juvenile to terminate the parental rights of [Mother] pursuant to [N.C. Gen. Stat. §] 7B-1110.

Mother challenges Findings of Fact 8, 10, 13, 14, and 15 as being unsupported by the evidence. As discussed above, we conclude that Finding of Fact 8 was supported by competent evidence; Mother has a long history of unaddressed emotional volatility, and the court properly determined grounds existed to terminate Mother's parental rights.

Mother argues Finding of Fact 10 was unsupported by any testimony that Bryson "had a great deal of anxiety." She contends "the social worker only testified Bryson had some small fear and anxiety about the future." However, the social worker further testified that Bryson's anxiety had been more severe, and he would express concern when Mother was inconsistent with visitation. He previously would

"throw fits" at the end of visits with Mother, especially at the end of overnight visits, but once those ended, his behavior improved. She further described the case as "an emotional rollercoaster for" Bryson, but over the course of three years he had arrived at a "great space . . . where he's no longer worrying about his case, where he resides, or where he goes." The social worker testified that less than a year prior, Bryson would "worry about where his mom was" or if he would have to live in the "homeless hotel" with her, and she noted that Mother's conversations with Bryson regarding her living situation "should have never happened" and caused "a lot of anxiety" for Bryson. The court also accepted into evidence the guardian ad litem's report, which detailed Bryson's struggle with anxiety, and his need for specific trauma therapy to cope with the trauma he suffered. The report also noted that Bryson has become more "aware of his situation[,]" which added "unnecessary stress on him." Thus, we conclude sufficient evidence supports the court finding Bryson had "suffered a great deal of anxiety stemming from [Mother's] actions and lack of follow through."

Mother also contends the court's findings regarding her bond with Bryson in Finding of Fact 10 were unsupported because there was "no evidence offered if the bond between Bryson and [her] was healthy or unhealthy[,]" if "their bond had been weakened[,]" or if "Bryson would remain indefinitely in foster care if Mother's rights were not terminated." The trial court specifically found that it could not determine if the parent-child bond was healthy or unhealthy. The proffered testimony supported this uncertainty and the court finding that the parent-child bond was

"weakened" by Mother's lack of stability. Both the social worker and the guardian ad litem testified to the bond between Mother and Bryson, and both stated their belief it was still in Bryson's best interest to terminate Mother's parental rights because Bryson needed stability after three years of uncertainty.

Moreover, "the bond between parent and child is just one of the factors to be considered under [N.C. Gen. Stat.] § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437 (citation omitted). In *In re Z.A.M.*, the respondents argued "that the trial court did not give enough weight to the children's bond with them[.]" 374 N.C. at 100. Our Supreme Court disagreed, concluding that "the trial court's findings in this case show that it considered the dispositional factors in [N.C. Gen. Stat.] § 7B-1110(a) and performed a reasoned analysis in weighing those factors." *Id.* at 101. "Based on its weighing of the factors, the trial court ultimately determined the best interests of the children would be served by terminating respondents' parental rights despite the children's bond with them." *Id.* Thus, we conclude that Finding of Fact 10 is adequately supported by the evidence, and the court properly considered Bryson's bond with Mother as one of the relevant factors on disposition.

Finally, Mother makes no argument regarding Finding of Fact 14 and merely asserts that Finding of Fact 15 is "a conclusion of law that should be reviewed *de*

*novo*."[3]  Thus, Mother's challenges to the Findings of Fact are without merit.

In the unchallenged dispositional findings of fact discussed above, the trial court considered Bryson's age, his likelihood of adoption, whether termination of Mother's parental rights would assist in accomplishing Bryson's permanent plan of adoption, and his relationship with the proposed adoptive parent.  As "it is clear from the termination order that the trial court considered the relevant dispositional criteria, made proper findings, and made a reasoned determination that termination of parental rights was in the juvenile's best interest" we will "not second-guess the trial court's best interests determination."  *In re R.G.L.*, 379 N.C. at 469-70.

Therefore, "[b]ecause the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors, we are satisfied the trial court's best interests determination was not manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision[,]" *In re Z.A.M.*, 374 N.C. at 101, and the trial court did not abuse its discretion in concluding that termination of Mother's parental rights was in Bryson's best interest.

## III.  Conclusion

We conclude that the trial court did not err by finding grounds to terminate Mother's parental rights to Bryson pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) nor

---

[3] We note that Finding of Fact 15, that "[i]t is in the best interest of [Bryson] to terminate the parental rights of [Mother] pursuant to 7B-1110" is a conclusion of law; however, as discussed above, we review a trial court's determination as to whether it is in the best interest of a juvenile to terminate parental rights under an abuse of discretion standard.  *See In re Z.L.W.*, 372 N.C. at 436.

in concluding that termination of Mother's parental rights was in Bryson's best interest. The trial court's order is affirmed.

AFFIRMED.

Before a panel consisting of Judges COLLINS, CARPENTER, and STADING.

Report per Rule 30(e).